### AMERICAN DIST. STEAM CO. v. WALTERMIRE.

### In re FINDLAY MOTOR CO.

(Circuit Court of Appeals, Sixth Circuit. April 4, 1916.)

### No. 2720.

1. COMPROMISE AND SETTLEMENT ⬚⇒6(1)—VALIDITY.

The S. Co., owning a majority of the stock of the T. Co., which manufactured motor trucks, sold such stock to the F. Co. for an amount payable in installments, and agreed to assume the debts of the T. Co., consisting of amounts due itself and its officers and $20,000 due a bank. Without a formal transfer, the F. Co. took possession of the T. Co.'s assets. Subsequently a receiver was appointed for the F. Co. at a time when $19,500 remained unpaid on the purchase price of the stock. The S. Co. had paid $10,000 to the bank, and it purchased part of the notes for the balance, and it and the bank asserted their claims as creditors of the T. Co. against property then in the receiver's possession, valued at $25,000 or more, which had belonged to the T. Co. Thereupon the receiver made an agreement with the S. Co. whereby he issued receiver's certificates with the court's approval to the S. Co. and the bank for $10,000, subject to certain prior certificates, and released the S. Co. from its obligations under the prior contract, and the S. Co. credited the $10,000 upon its claim for $19,500, and released all claims against former property of the T. Co. upon the notes for $10,000 and all similar notes. *Held,* that the situation was such as justified a compromise to avoid litigation, as the receiver, by advancing $10,000 of the S. Co.'s claim to the rank of a

second preferred claim, secured at the least, and even if the claims could be defeated, escape from litigation and expense and damages from delay in carrying out the receivership plans.

[Ed. Note.—For other cases, see Compromise and Settlement, Cent. Dig. §§ 35, 42, 44–49; Dec. Dig. ⊚═6(1).]

**2.** COMPROMISE AND SETTLEMENT ⊚═19(1)—CLAIMS—CONSIDERATION.

That the receiver, in reporting the settlement with the S. Co. to the court, did not exhibit a copy of the contract, but reported only his conclusion as to the justness of the S. Co.'s contention, thus leading the court to believe that the S. Co.'s claims were clear, rather than doubtful, did not justify the cancellation of the receiver's certificates after such proceedings had been had as made it impossible to put the S. Co. in statu quo, where the receiver acted in good faith and on the advice of counsel, as, even though the S. Co. was wrong in its position, it would nevertheless have been prudent to approve a reasonable compromise and avoid delays and appeals.

[Ed. Note.—For other cases, see Compromise and Settlement, Cent. Dig. §§ 67, 75; Dec. Dig. ⊚═19(1).]

**3.** COMPROMISE AND SETTLEMENT ⊚═19(1)—CLAIMS—VALIDITY.

Where, after the settlement, the business was continued, the proceeds of sales of trucks received from the T. Co. were mingled and expended or reinvested, the material on hand was used up, and the machinery and other remaining assets which the S. Co. might have claimed were united with other assets in one gross sale, and it was impossible to trace the proceeds, and tell what part of the final purchase price was realized from the disputed assets, the S. Co. could not be put in statu quo upon a cancellation of the receiver's certificates.

[Ed. Note.—For other cases, see Compromise and Settlement, Cent. Dig. §§ 67, 75; Dec. Dig. ⊚═19(1).]

**4.** COMPROMISE AND SETTLEMENT ⊚═9—CLAIMS—CONSIDERATION.

The S. Co., in urging its claim, in settlement of which the receiver's certificates were issued, was not seeking to rescind its contract with the F. Co., but was rather insisting upon specific performance, as it only claimed that it should not be compelled to carry out the remainder of its contract and pay the rest of the T. Co.'s debts, unless the F. Co. carried out the remainder of its contract and furnished the money it had agreed to furnish, which could then be devoted to paying the debts.

[Ed. Note.—For other cases, see Compromise and Settlement, Cent. Dig. §§ 32–34; Dec. Dig. ⊚═9.]

Appeal from the District Court of the United States for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

Receivership suit against the Findlay Motor Company. On petition of Beecher W. Waltermire, trustee in bankruptcy of the Findlay Motor Company, the court canceled receiver's certificates issued to the American District Steam Company, and required it to make good the amount of certificates issued to another party, and the Steam Company appeals. Reversed and remanded.

This controversy involves three corporations: The American District Steam Company and the American Motor Truck Company, both organized under New York laws, and the Findlay Motor Company, an Ohio corporation. They will be called, respectively, the Steam Company, the Truck Company and the Findlay Company. The Truck Company was actively manufacturing motor trucks, at Lockport, N. Y. It was, in a sense, a subsidiary of the Steam Company, which owned 510 out of the 760 shares of the capital stock of the Truck Company. The Findlay Company, engaged in similar business, desired to succeed to the business of the Truck Company. Accordingly, a contract in writing was

made, in February, 1911, between the Findlay Company and the Steam Company, whereby the Steam Company agreed to sell to the Findlay Company the entire capital stock of the Truck Company, and to assume to pay all the debts of the Truck Company—all the accounts and receivables of the Truck Company to be taken over by the Steam Company. On its part, the Findlay Company agreed to pay to the Steam Company $1,000 down, $24,000 in 32 monthly payments of $750 each, and $30,000 in the capital stock of the Findlay Company. Thereupon, but without any formal transfer from the Truck Company, the Findlay Company took possession of the assets, being machinery, materials, and manufactured trucks, and added them to its own property in its own plant. These assets inventoried about $45,000. The debts of the Truck Company which the Steam Company assumed consisted of $20,000 owing to itself, $8,000 owing to some of its officers for personal loans made to the Truck Company, and $20,000 owing upon the promissory notes of the Truck Company to a Lockport bank. The machinery, taken over by the Findlay Company, became a part of its own plant. The materials which it took over, it partly or wholly manufactured and sold in finished form, and of the 14 completed trucks which it took over at $2,000 each, it sold about 10. The purchase price of those which it sold had not been paid to it in November, 1911.

For a time after the contract of February, the Findlay Company continued to pay its monthly notes and the Steam Company continued to pay the debts of the Truck Company. In September, 1911, on a bill by creditors and the practical consent of the Findlay Company, the court below appointed a receiver for that company. At that date, the Findlay Company had paid to the Steam Company its down payment of $1,000 and its monthly notes to a total of $4,500, leaving $19,500 unpaid, and the Steam Company had paid $10,000 of the Truck Company's notes at the Lockport bank. Thereupon the Steam Company purchased from the bank $7,500 of the remaining $10,000 of these notes, and in November, 1911, the Steam Company and the bank asserted their claims as creditors of the Truck Company against all the property, which had belonged to the Truck Company, which was said never to have been transferred to the Findlay Company, but which was in the possession of its receiver. It demanded the machinery and the materials on hand, and gave notice to the purchasers of the trucks that it, the Steam Company, and not the receiver of the Findlay Company, was entitled to payment. The value of the property thus claimed was $25,000, or more. The Steam Company had theretofore filed its claim with the receiver as a creditor for the $19,500, but claimed to have done so under a misapprehension of fact.

The controversy between the Steam Company and the receiver soon crystallized into a dispute as to the effect of the February contract. Was the agreement of the Steam Company to pay the Truck Company's debts for the benefit of the Findlay Company dependent on the Findlay Company's agreement to pay the purchase price of the Truck Company stock, so that the Steam Company was justified in refusing to pay $19,500 of the debts, or was the agreement independent, so that the Steam Company was bound to pay all this indebtedness and stand only as a creditor of the Findlay Company upon the purchase price notes?

Counsel for the Steam Company and the bank came to Findlay, the receiver was advised by counsel, and a settlement was made by which the Steam Company and the bank were to abandon all claims against all property in the receiver's hands, the receiver was to give to the Steam Company and the bank receiver's certificates for the $10,000 and interest, subject to prior outstanding certificates, and the Steam Company was to credit the entire $10,000 upon its $19,500 claim on file. Upon a petition filed by the receiver reciting generally this situation and agreement and indorsed with the approval of the plaintiff in the receivership case, the court below approved this contract and ordered the certificates to issue and mutual releases to be delivered as agreed. Accordingly the certificates were delivered, and in January, 1912, the Steam Company and the bank canceled and discharged the $10,000 notes, the Steam Company released all claims which it might have against the former property of the Truck Company upon these notes and all similar notes, or which it might have against the Findlay Company for misapplying the proceeds of sales, and credited the receiver's certificates upon the face of the

claim on file, and the receiver released the Steam Company from all further and future accruing obligations under the February contract. Matters stood in this shape during 1912, while various proceedings were pending; but in December, 1912, the court ordered all the plant and property of the Findlay Company to be sold. This was done in February, 1913, and $50,000 realized. In the meantime, bankruptcy proceedings had been instituted against the Findlay Company, and the court ordered $12,500 of the proceeds to be held in court as a fund to provide for these certificates, if they should be held valid as against the expected opposition of the trustee in bankruptcy. Later, upon the petition of the trustee, claiming that the certificates had been improvidently issued, the court made an order canceling the $7,500 of certificates issued to the Steam Company, confirming the $2,500 certificates to the bank, but providing that the Steam Company should make good to the trustee the amount of the bank certificates. From this order the Steam Company appeals.

N. D. Fish, of North Tonawanda, N. Y., and David Tice, of Lockport, N. Y., for appellant.

Hiram Van Campen, of Findlay, Ohio, for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and HOLLISTER, District Judge.

DENISON, Circuit Judge (after stating the facts as above). 1. The question mainly considered by the court below and argued here is whether the covenant of the Steam Company to pay the debts of the Truck Company, thereby giving to the capital stock of the Truck Company the greater part at least of its selling value, and the covenant of the Findlay Company to pay to the Steam Company the purchase price of this capital stock, were dependent upon each other, or whether they were independent, so that, therefore, the Steam Company had no right, as against the Findlay Company, to purchase the Truck Company's debts or otherwise stand as its creditor, and so that there was no sufficient justification for the issue of the receiver's certificates. This main question we find no occasion to decide; for the purposes of this opinion we assume that the conclusion reached below was right; but we think that, for other reasons, the result which was reached cannot be sustained.

[1] 2. The situation which existed when the Steam Company and the receiver reached an agreement was typical of those which justify a compromise to avoid litigation. It cannot be doubted that the Steam Company's claims were made in good faith. So far as expressly stated, they extended only to the last $10,000 of the bank notes, but it was as obvious then to the receiver as it is now to all that these claims extended also to the $20,000 of the Steam Company's own notes, which had been formally paid or canceled, if at all, only by bookkeeping entries. Since all these claims, as against the Findlay Company, could have been met by paying the $19,500 notes, it follows that the receiver was confronted by a situation where a $19,500 claim might be established as absolutely preferred, or else take away the bulk of the assets of the receivership, or at least enough to destroy the integrality of the plant and business. By advancing $10,000 of the claim to the rank of second preferred, at an apparent cost of the difference on $10,000 between par and the then expected general dividend, he secured, at the least and even if the claims could be defeated, escape from litiga-

tion and expense and damages from delay in carrying out the receivership plans, all of which might well amount to more than the difference between par and dividend on $10,000. That all this was in the minds of the parties is shown by the care with which the Steam Company's release was made to cover "all other similar notes." Indeed, the settlement seems practically to have included the $8,000 of individual claims.

[2] The only reason urged for doubting that the validity of the certificates was sufficiently supported, as being an accord and satisfaction of the dispute, is that the situation was not fully presented to or understood by the court when the certificates were authorized. It is quite true that the petition of the receiver, reporting the settlement made with the Steam Company, did not exhibit a copy of the contract, and reported only the conclusion of the receiver that the two covenants had been dependent, and that the Steam Company was right in its contention. It is true also that the counsel for the Steam Company participated in this incomplete presentation of the facts. It is natural that the court should have felt surprise when it was later disclosed that the claims of the Steam Company were doubtful rather than clear; but the court below does not find, nor do we see any indication that there existed, any overreaching of the receiver by the Steam Company or any intent to deceive or to mislead the court. The receiver was a capable business man. He was advised by his counsel; at the worst, they made a mistake of law; and in good faith they stated to the court the conclusion which they had reached. Indeed, it is clear enough that, even if the original contract had been fully stated and the court had concluded that the Steam Company was wrong in its position, nevertheless it would have been prudent to approve a reasonable compromise and avoid delays and appeals. The utmost result reached by this view is that the compromise might have been at a figure somewhat more favorable to the receiver.

[3] Even from this aspect, we would hesitate to reverse the action of the court below in canceling the receiver's certificates, except that it is impossible upon such cancellation, to put the Steam Company back in statu quo. During the period after the settlement, the business was continued, the proceeds of the trucks sold were mingled and expended or reinvested, the material on hand used up, and, at the end, the machinery and other remaining assets which the Steam Company might have claimed, were united with other assets in one gross sale. It is impossible to trace the proceeds of this property converted during the receivership and impossible to tell what part of the final purchase price was realized from the disputed assets then remaining. Even if there had been a substituted right to proceed against the entire $12,500 fund, this is not the equivalent of a right to assert and litigate a $19,500 claim against $25,000 of property, and the latter right is what the Steam Company gave up. This consideration we think enough to turn the scale and to require that the certificates should be paid.

[4] 3. It is also said that the claim of the Steam Company, when it was procuring these certificates, was upon the theory that it had

a right to rescind the original contract, and it is urged—perhaps convincingly—that no such right of rescission existed. We think this interpretation misapprehends the real situation. The position of the Steam Company did not depend upon any right of rescission or theory of rescission. It was rather insisting upon specific performance. It did not propose to affect the executed portion of the contract. It did not suggest that the Findlay Company should give back the capital stock which it had purchased, or that the Steam Company should refund that part of the purchase price it had received. It only claimed that it should not be compelled to carry out the remainder of its contract and pay the rest of the Truck Company's debts, unless the Findlay Company would carry out the remainder of its contract and furnish the money it had agreed to furnish which could then be devoted to paying these debts. It is, of course, obvious that the right to discontinue further performance of a contract and to disregard the same for the future is quite a different thing from the right to rescind. Both parties had partly performed, and each had stopped further performance. They adjusted and compromised their executory obligations. There was no fraud and no gross unfairness. Both have acted upon the agreed basis, and one cannot be restored to his former position.

The order appealed from is reversed, and the case remanded for proceedings in accordance with this opinion.